UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

DAVID CORRAL,                          )
                                       )
       Plaintiff,                      )
                                       )        No. 10-CV-03379
       v.                              )
                                       )
UNO CHARTER SCHOOL                     )        Judge Edmond E. Chang
NETWORK, INC.,                         )
                                       )
       Defendant.                      )

**MEMORANDUM OPINION AND ORDER**

Plaintiff David Corral, a teacher, brought this suit against his former employer, Defendant UNO Charter School Network, Inc., alleging that UNO fired him in retaliation for reporting an assault on a student during gym class, in violation of Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 *et seq.* R. 1, Compl.[1] Corral also brought a claim under Illinois common law for retaliatory discharge. *Id.* at 9-11. UNO moves for summary judgment on both claims. R. 106. For the reasons explained below, UNO's motion for summary judgment is denied.

**I. Background**

In evaluating this summary judgment motion, the Court must view the facts in the light most favorable to the non-movant (here, Corral), and also must draw reasonable inferences in his favor. UNO Charter School Network is an Illinois non-profit corporation that operates charter public schools in the Chicago area. R. 104,

---

[1]This Court has subject matter jurisdiction over Corral's Title IX claim pursuant to 28 U.S.C. § 1331, and over his state law claim pursuant to 28 U.S.C. § 1367. Citation to the record is "R." followed by the entry number.

Def.'s Statement of Facts (DSOF) ¶ 2. Through the Chicago Public School District, UNO receives federal funds to operate its schools. R. 116, Pl.'s Statement of Add'l Facts (PSAF) ¶ 2; R. 137, Def.'s Resp. to Pl's Statement of Add'l Facts (DSAF) ¶ 2. Plaintiff David Corral was the Wellness Fitness Specialist (that is, the physical education teacher) at one of UNO's schools, Dr. Hector P. Garcia, M.D. High School, up until the time he was fired on December 4, 2009. DSOF ¶ 1. Corral had been working as the physical education teacher at Garcia High School since August 2008. *Id.* ¶ 3.

Starting in October 2009, Corral and his students began using a gymnasium facility with separate locker rooms for male and female students. PSAF ¶ 11. (During the 2008-2009 school year, Garcia High School's inaugural year, the school lacked formal gymnasium facilities and used a nearby park. *Id.* ¶¶ 7, 9, 11.) It was UNO's policy that Corral take attendance, and then input it into a computer, within the first five minutes of class. *Id.* ¶ 21. In August and September of 2009, Corral complained to one of the high school's administrators about the policy because the students were changing clothes during the first five minutes of class. *Id.*; R. 116-5, Pl.'s Group Exh. 9 (8/25/09 Corral Email, 9/15/09 Corral Email). UNO did not respond to Corral's complaints about being required to take attendance during the first five minutes of class. *See* Pl.'s Group Exh. 9.

On November 24, 2009, Corral taught a gym class of around 25 to 30 students. DSOF ¶ 5. The students sat down on the gym floor when they first arrived while Corral took attendance with handwritten notes. *See id.* The students then went into the locker rooms to change into gym clothes and Corral went to his office to input the attendance

2

information into a program on his laptop. *Id.* ¶ 7. Going into his office was not the usual procedure: UNO had provided Corral with a movable podium for his laptop, DSOF ¶ 6, and he usually set up his laptop on the podium between his office and the locker rooms while taking attendance so that he could listen for disturbances amongst the students. PSAF ¶ 23. But Corral did not use the podium on November 24 because he needed to recharge the battery on his laptop. R. 117, Pl.'s Resp. to Def.'s Statement Facts (PSOF) ¶ 6.

After Corral finished inputting attendance on his laptop, he went back to the gym and stood near the entrances to the locker rooms (the girls' and boys' locker rooms were next to each other). PSOF ¶ 7; *see also* PSAF ¶¶ 16-17. Within five minutes, everyone in the class had returned to the gym from the locker rooms except one student, referred to here as "M.L."[2] DSOF ¶ 8. Corral went into the boys' locker room in search of M.L. and found him standing, shirtless, near the lockers. *Id.* ¶ 9. Corral told M.L. that M.L. was supposed to be in the gym, at which point M.L turned around and told Corral that he did not have a shirt to wear. *Id.* Once M.L. turned around, Corral noticed that M.L.'s chest was very red. *Id.* When Corral asked him what happened, M.L. said nothing happened. *Id.* ¶ 10. Corral continued to press the student, saying to M.L. that it looked he "just got beat up." *Id.* While Corral and M.L. were talking, another student entered the locker room, and M.L. asked the other student if he could borrow a gym shirt. *Id.* The other student gave M.L. a shirt, and Corral told

---

[2]All students involved are identified only by their initials, in accordance with Federal Rule of Civil Procedure 5.2(a).

M.L. to get dressed and return to the gym quickly because the rest of the class was waiting. *Id.*

Corral and the two students returned to the gym and Corral started class. *Id.* ¶ 11. Once class began, Corral sent a text message about M.L. to Andres Avila, a student counselor at UNO. *Id.* The text message stated (in substance):

> Someone was bull[y]ing M.L. and he's not talking. He was dragging in the locker room and when I walked in his back and chest were all red. Like he was fighting.

*Id.* Avila came to the gym before Corral's class ended, and Avila and Corral took M.L. into Corral's office to question him about the incident. *Id.* ¶ 12. M.L. again refused to say what happened. *Id.* Corral had another class to teach, so Avila took M.L. to Avila's office to question him further. *Id.* Avila learned from M.L. that two UNO students, J.C. and J.C.N., were the aggressors, but it is not clear what details Avila learned at that point about the nature of the incident. PSAF ¶ 27; DSAF ¶ 27; R. 116-5, Pl.'s Exh. 12 (Incident Report).[3] Both parties agree that UNO administrators ultimately conducted an investigation, which included interviewing all of the boys from the gym class, and that at some point the Chicago Police also became involved and UNO students were arrested as a result of the incident. *See* DSOF ¶¶ 13, 27; PSAF ¶¶ 28, 29; DSAF ¶ 29.

---

[3]Plaintiff's Exhibit 12 is an Incident Report that contains notes of interviews with the students who were in the boys' locker room at the time of the incident. The report was compiled by Norma Guzman (Garcia High School's Assistant Principal), Ellen Blattner (a school counselor), and Andres Avila. A revised version of the report was emailed to Principal Gomez on December 2, 2009. *See* R. 116-7, Pl.'s Exh. 19.

The investigation revealed multiple versions and characterizations of what happened in the locker room. PSAF ¶ 30; Incident Report. M.L. said that he was targeted "at random," and that the aggressors "grind[ed]" him and other students. Incident Report at D000397-98. As recounted in the Incident Report, M.L. also apparently stated that "I felt assaulted—if I didn't fake it, it would have gone further. I felt like I was being raped, when someone gets on top of you and you want them to stop but they don't." *Id.* at 398. Other students characterized the nature of the attack as "horseplay," "humping," and a "thrusting motion." *Id.* at D000397. J.C., one of the aggressors, explained that "[s]ometimes, we act gay . . .[but] I know I'm not gay." *Id.* at D000398. Some students also reported that the behavior by the aggressors had been going on for 1-2 weeks or a month, and that other students had been targeted. *Id.* at D000397.

Corral contends that he participated in the investigation of the locker room incident. PSAF ¶ 29. UNO counters that Corral's participation was limited to being questioned about what he knew of the incident. DSAF ¶ 29. Because it is important to the issues presented by this summary judgment motion, here are the details of each instance in which Corral communicated with Garcia High School and/or UNO administrators about the locker-room assault[4]:

- Corral had a conversation with Avila at the end of the day on November 24, wherein Corral learned what M.L. told Avila about the incident.

---

[4]The assault occurred on the Tuesday before Thanksgiving, so after Corral left work on November 24 he did not return to work until Monday, November 30. *See* R. 104-2, Def.'s Exh. B (Corral Dep.) at 38.

DSOF ¶ 14. Corral does not remember speaking to any other UNO administrators or teachers that day about the incident. *Id.*

- Corral next spoke about the incident with an UNO administrator on November 28, when he spoke by phone with Josephine Gomez, Garcia High School's Director (that is, the school's principal). *Id.* ¶¶ 15, 34. Corral told Principal Gomez about what he observed in the locker room on November 24, and told her that he contacted Avila about the incident. *Id.* ¶ 16.

- Corral sent Principal Gomez an email two days later, on November 30, wherein Corral stated that he observed "what appeared to be evidence of a fight" when he entered the locker room. *Id.* ¶ 17; R. 104-6, Def.'s Group Exh. F. Corral also commented on his supervision of the students that day, and requested "more specific policies and procedures" about how he should "balance the concerns of safety and privacy of the students" when supervising the locker rooms. Def.'s Group Exh. F.

- On December 3, Corral met with Principal Gomez and Sister McCarry, UNO's Director of Academic Affairs. DSOF ¶ 22; PSAF ¶ 3. Corral again repeated his knowledge of the November 24 event. DSOF ¶ 22.

- Corral met with Principal Gomez and Sister McCarry again on December 4. DSOF ¶ 23. During this meeting, Corral was fired. *Id.* ¶ 24. After being told that he was fired, Corral raised several issues surrounding the November 24 event, including that one of the perpetrators, J.C., had disciplinary problems and should not have been allowed to return to school, and that "there is absolutely no way that I could—that I could supervise boys' locker room, girls' locker room, and all the students that are in the gym." DSOF ¶ 24; PSOF ¶ 24.[5] Corral also stated that he believed he was being fired for reporting a "sexual assault." DSOF ¶ 24. Corral states that when he mentioned J.C.'s disciplinary problems, Sister McCarry covered her ears, and said "I can't hear that, I can't hear that." PSAF ¶ 36. UNO denies that Sister McCarry had that reaction. DSAF ¶ 36.

---

[5]UNO's Statement of Facts contends that Corral raised concerns that M.L., not J.C., was allowed to return to school. But M.L. was the victim on November 24, and after reviewing the section of Corral's deposition transcript cited by UNO, it is clear that Corral actually referred to one of the aggressors, not to M.L. *Compare* Corral Dep. at 75-76 (referring to "Student H") *with* R. 115, Pl.'s Response at 3 (noting that J.C. is sometimes referred to as "Student H").

Several UNO and Garcia High School administrators testified in depositions about why, according to them, Corral was fired. Juan Rangel, UNO's Chief Executive Officer, testified that Corral was fired because of his inattentiveness to the students in his class when the incident occurred. DSOF ¶ 28. Rangel explained that if Corral were doing his job he probably would have heard the incident as it was occurring. *Id.* ¶ 32. Principal Gomez testified that her understanding was that Corral was fired because of his non-supervision of students during the incident. *Id.* ¶ 36. Principal Gomez stated that the fact that Corral was not in or around the locker rooms at the time of the incident constituted a lack of supervision. *Id.* Sister McCarry testified that Rangel was concerned that Corral had acted negligently by not monitoring the locker room. *Id.* ¶ 37. In response to all of this, Corral states that UNO's offered reason for firing him is false and pretextual, *see, e.g.* PSOF ¶ 28, and cites evidence that is detailed in the analysis below.

## II. Standard of Review

Summary judgment must be granted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In evaluating summary judgment motions, courts must view the facts and draw reasonable inferences in the light most favorable to the non-moving party. *Scott v. Harris*, 550 U.S. 372, 378 (2007) (citations omitted). The Court may not weigh conflicting evidence or make credibility

7

determinations, *Omnicare, Inc. v. UnitedHealth Grp., Inc.*, 629 F.3d 697, 704 (7th Cir. 2011) (citations and quotation marks omitted), and must consider only competent evidence of a type otherwise admissible at trial, *Gunville v. Walker*, 583 F.3d 979, 985 (7th Cir. 2009) (citations omitted). The party seeking summary judgment has the initial burden of showing that there is no genuine dispute and that the movant is entitled to judgment as a matter of law. *Carmichael v. Vill. of Palatine*, 605 F.3d 451, 460 (7th Cir. 2010) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)); *Wheeler v. Lawson*, 539 F.3d 629, 634 (7th Cir. 2008)). If this burden is met, the adverse party must then "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 256.

### III. Analysis

Corral alleges that UNO fired him for reporting the locker room incident because it attracted unwanted attention to Garcia High School, and that in doing so, UNO violated Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 *et seq.*, and Illinois common law prohibiting retaliatory discharge. UNO moves for summary judgment on both claims, but as explained below, there are genuine issues of fact for a jury to resolve, so the motion is denied.

### A. Title IX Claim

Corral's first claim is based on retaliation under Title IX, 20 U.S.C. § 1681 *et seq.* "Title IX prohibits sex discrimination by recipients of federal education funding." *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 173 (2005) (citing 20 U.S.C. § 1681(a)). "[T]he text of Title IX prohibits a funding recipient from retaliating against

a person who speaks out against sex discrimination, because such retaliation is intentional discrimination on the basis of sex." *Id.* at 178 (internal quotation marks omitted). The framework for analyzing a Title IX retaliation claim is the same as the framework for analyzing a retaliation claim under Title VII, 42 U.S.C. § 2000e *et seq.*, the law that bars various forms of employment discrimination. *See Milligan v. Bd. of Trs. of S. Ill. Univ.*, 686 F.3d 378, 388 (7th Cir. 2012). Corral seeks to prove his retaliation claim through the direct method of proof, and therefore must show that (1) he engaged in a statutorily protected activity; (2) UNO took a materially adverse action; and (3) there is a causal connection between Corral's protected activity and the adverse employment action. *Id.* .at 388. UNO challenges Corral's evidence on both the first and third elements.

First, UNO contends that no reasonable jury could find that Corral engaged in statutorily protected activity. Specifically, UNO argues that the undisputed evidence shows that Corral did not believe he was reporting an incident of sex discrimination prohibited by Title IX, and therefore a reasonable jury could not find that UNO retaliated against Corral for engaging in statutorily protected activity under Title IX. R. 106, Def.'s Motion at 7-13. Unlike a claim of direct discrimination, where a plaintiff must prove that prohibited discrimination actually occurred, to prove retaliation Corral need only prove that he had a "sincere and reasonable belief that he [opposed] an unlawful practice." *Hamner v. St. Vincent Hosp. &Health Care Ctr., Inc.*, 224 F.3d 701, 706-07 (7th Cir. 2000) (citations omitted). *Hamner* emphasized that a "plaintiff must not have only have a subjective (sincere, good faith) belief that he opposed an unlawful

9

practice; his belief must be objectively reasonable.*" Id.* at 707. Put another way, Corral's belief that he was reporting sex discrimination must be grounded on some objectively reasonable basis in the law: the belief "cannot be without legal foundation, but must concern the 'type of activity that, under some circumstances, supports a charge of sexual harassment.'" *Id.* (quoting *Holland v. Jefferson Nat'l Life Ins. Co.*, 883 F.3d 1307, 1315 (7th Cir. 1989)).

To determine whether Corral's belief that he was reporting a Title IX violation was objectively reasonable, it is necessary to identify exactly what constitutes "sex discrimination" under Title IX, specifically in the context of sexual harassment-type claims. As an initial matter, the Supreme Court has held that, in certain situations, student-on-student harassment may state a claim for sex discrimination against a school under Title IX. *See Davis ex rel. LaShonda D. v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 633 (1999) ("[A] private damages action may lie against the school board in cases of student-on-student harassment . . . but only where the funding recipient acts with deliberate indifference to known acts of harassment in its programs or activities."). Furthermore, that the victim and the harasser are of the same sex does not necessarily preclude a Title IX claim. The Supreme Court has explained that same-sex harassment can constitute sex discrimination if the harassment is (1) motivated by sexual desire; (2) motivated by hostility towards a specific gender; or (3) demonstrates differential treatment of males and females. *See Oncale v. Sundowner*

10

*Offshore Servs., Inc.*, 523 U.S. 75, 80-81 (1998).[6] Those three categories are not necessarily exhaustive in describing prohibited same-sex harassment. *Shepherd v. Slater Steels Corp.*, 168 F.3d 998, 1009 (7th Cir. 1999).

At the motion to dismiss stage, the Court noted that "it is certainly plausible that [M.L.] was attacked because he did not conform to a gender stereotype," R. 83, August 15, 2011 Order at 3, so the Court allowed Corral's claim to move on to discovery. The Seventh Circuit has held that harassment based on "gender stereotyping" is prohibited discrimination under Title VII (and Title IX), because it relies "upon stereotypical notions about how men and women should appear and behave," and is therefore discrimination on the basis of sex. *Doe v. City of Belleville*, 119 F.3d 563, 581 (7th Cir. 1997), *vacated on other grounds by* 523 U.S. 1001 (1998) (mem.); *Howell v. N.. Coll.,* 320 F. Supp.2d 717, 722 (N.D. Ill. 2004) (applying the gender-stereotyping analysis to a Title IX claim). And at least one district court in this Circuit has specifically held that same-sex student harassment based on the victim's failure to adhere to gender norms does constitute sex discrimination under Title IX. *See Doe v. Brimfield Grade Sch.*, 552 F. Supp. 2d 816, 823 (C.D. Ill. 2008). But the Seventh Circuit has also held that harassment based solely upon a person's sexual *preference* or *orientation* (and not on one's sex or conformity to gender norms) is *not* a

---

[6]*Oncale* was a Title VII case, but the Supreme Court recognizes that Title VII cases should inform the analysis of sex discrimination claims under Title IX. *See Franklin v. Gwinnett Cnty. Pub. Sch.,* 503 U.S. 60, 75 (1992) (citing a Title VII case in deciding what type of conduct is prohibited under Title IX); *see also Doe v. Univ. of Ill.*, 138 F.3d 653, 665 (7th Cir. 1998).

basis for a sex discrimination claim. *Ulane v. E. Airlines, Inc.*, 742 F.2d 1081, 1086 (7th Cir. 1984); *Howell*, 320 F. Supp. 2d at 722 (applying rule in the context of Title IX).

Returning to this case, UNO argues that "[t]he facts clearly set forth that, although the conduct was immature and inappropriate, that such conduct did not involve the targeting of any one due to the failure to follow gender norms." R. 135, Def.'s Reply at 7. Corral counters that "discovery turned up evidence that the harassment targeted non-conformity to gender norms. . . . It came out that M.L., who was new to Garcia High, was taunted in class as 'gay.' . . . . The students pretended to be gay, and mocked others as gay." Pl.'s Resp. at 13 (citing PSAF ¶ 30). For this factual assertion, Corral cites two pages of Sister McCarry's deposition, as well as Sister McCarry's investigation notes. PSAF ¶ 30. But those citations do not say what Corral argues they say. In the cited portions of her deposition, Sister McCarry, interpreting her investigation notes, testified that another male student was also a victim of abuse, that the student and M.L. were "made fun of [sic] being gay," and that Corral once witnessed the students calling each other gay in class and told them to stop. R. 116-3, Pl.'s Exh. 3 (McCarry Dep.) at 63:13-16 (interpreting R. 116-5, Pl.'s Exh. 15 (McCarry Notes) at D000289), 69:13-22 (interpreting McCarry Notes at D000290). Even taking this evidence and all reasonable inferences from it in Corral's favor, a reasonable jury could not rely on this evidence to find that the attack on M.L. was based on failing to conform to gender norms. At most, the evidence shows that students in the class called M.L. (and possibly another student) gay, but remember that the Seventh Circuit says that harassment based on sexual orientation is not sex discrimination under Title IX.

*Ulane*, 742 F.2d at 1086.[7] In addition, there is evidence that M.L. and other students were targeted at random by their harassers, which would refute the inference that M.L. was targeted because he was viewed by his attackers as effeminate. *See* Incident Report at D000398 ("M.L said that students are targeted at random . . . ."); *id.* ("A.M. confirmed that they chose kids every week . . . ."). Based on the record evidence, the gender-norms theory of same-sex harassment did not pan out in discovery.

But the evidence does support another form of same-sex harassment. Corral has presented sufficient evidence to withstand summary judgment on the protected-activity element because a reasonable jury could conclude that Corral believed that the attack on M.L. was a "sexual assault," in the sense that M.L.'s attackers were motivated by sexual desire. Specifically, Corral cites evidence that, during the assault, the perpetrators rubbed their genitals against M.L., who was shirtless at the time, and meanwhile the attackers were saying that they were going to "rape" him. PSAF ¶¶ 27, 30; Incident Report at D000397-98; McCarry Dep. at 63; McCarry Notes at D000289. And remember that, after the assault, M.L. described it this way: "I felt assaulted—if I didn't fake it, it would have gone further. I felt like I was being raped, when someone

---

[7]*Brimfield,* which held that "sac-stabbing" (grabbing, twisting, and hitting a person's testicles) by male students against the male plaintiff may be actionable "gender stereotyping" harassment under Title IX, 552 F. Supp. 2d at 823, is distinguishable. First, *Brimfield* decided whether the plaintiff's claims could proceed past the motion to dismiss stage, a stage which Corral too survived based on the allegations in his complaint. *Id.* at 819. Second, there the victim-student alleged that the school "essentially told [plaintiff] to toughen up and stop acting like a little girl," which the district court determined was sufficient to state a claim for sex discrimination. *Id.* at 823. Here, Corral did not produce evidence that the harassment of M.L. was based on any type of gender stereotyping, such as evidence that M.L. was considered somehow un-masculine or effeminate.

gets on top of you and you want them to stop but they don't." Incident Report at D000398 (internal quotation marks omitted). If Corral believed that the attack could have been motivated by sexual desire (and that is a big "if," as discussed later), then it would be reasonable for Corral to believe that he was reporting sex discrimination under Title IX, because same-sex harassment motivated by sexual desire *is* one of the prohibited forms of sex discrimination. *See Oncale*, 523 U.S. at 80 (prohibiting same-sex harassment when motivated by sexual desire); *Davis ex rel. LaShonda D.*, 526 U.S. at 653-54 (finding a Title IX claim stated against school board where plaintiff was victim of criminal sexual misconduct by another student). Corral's meetings with UNO administrators and his complaints about his ability to monitor the locker rooms and prevent such assaults would, in turn, be activity that is protected by Title IX.

But objective reasonableness is not the end. Corral must show also that he had a "subjective (sincere, good faith) belief that he opposed an unlawful practice." *Hamner*, 224 F.3d at 707. Has Corral presented enough evidence that he actually believed that the attack was, or could have been, motivated by sexual desire? It is a close call. Corral never explicitly stated that he subjectively believed that the attack on M.L. was motivated by sexual desire or was otherwise the type of harassment prohibited by Title IX. *See generally* Corral Dep.; R. 116-6, Pl.'s Exh. 16 (Corral Decl.). But there is evidence that Avila, the counselor, told Corral that M.L. described the attack as a sexual assault. Specifically, in a declaration filed with his Statement of Additional Facts, Corral swears that he "learned from Mr. Avila that M.L. had told him that a student . . . *sexually assaulted* him by rubbing his genitals on M.L." Corral Decl. ¶ 31

14

(emphasis added). Viewing this evidence in the light most favorable to Corral, a reasonable jury could infer that when Corral later spoke to UNO administrators about the attack (on November 28 and 30, and December 3 and 4), he believed that M.L. was the victim of a sexual assault. And Corral already knew, before speaking to Avila, that M.L. had been subjected to some sort of assault in the locker room, one that left M.L. shirtless. Combined with what Corral later learned from Avila (the outright description of the attack as a sexual assault), that is enough evidence for a reasonable jury to find that Corral's conversations with UNO administrators about the incident, and especially his complaints that the school lacked policies and procedures to ensure proper supervision of the locker rooms (and presumably prevent the type of assault that occurred here), *see id.* ¶ 33; R. 116-6, Pl.'s Exh. 17 (11/30/09 Corral Email), and that one of the harassers should not have been allowed to return to the school, Corral Decl. ¶¶ 39-40, were protected activities under Title IX.[8] In other words, a reasonable jury could conclude that Corral was speaking up about UNO's policies (or lack thereof)

---

[8]UNO points to contrary evidence about Corral's beliefs about the nature of the incident, specifically that the first time that Corral reported the incident, he told Avila that "[s]omeone was bull[y]ing M.L." and that it looked like M.L. had been fighting. DSOF ¶ 11 (internal quotation mark omitted). UNO also objects to the characterization of the November 24 incident as an "assault" or "sexual abuse," and cites evidence from the investigation that presumably is meant to show that the conduct was not of a type prohibited by Title IX. *See* DSAF ¶ 30; *see also Oncale*, 523 U.S. at 82 (noting that "simple teasing or roughhousing among members of the same sex" may not constitute sexual harassment or discrimination); *Hamm v. Weyauwega Milk Prods., Inc.*, 332 F.3d 1058, 1060, 1064 (7th Cir. 2003) (finding no actionable sexual harassment where Hamm was called a "faggot," "bisexual," and "girl scout," and subjected to various sexually-charged workplace pranks in part because "sexually explicit remarks among male coworkers may be "simply expressions of animosity or juvenile provocation" (citation and internal quotation marks omitted)). At trial, UNO may introduce evidence that Corral did not subjectively believe that he was reporting Title IX-prohibited sexual harassment or discrimination, but the point is that Corral has created a genuine issue of material fact.

to prevent the type of sexual assault that occurred on November 24. Under that version of the facts, Corral engaged in statutorily protected activity.

UNO next argues that, even assuming Corral can establish that he engaged in statutorily protected activity, UNO has offered a non-retaliatory, non-pretextual reason for firing Corral, namely, that he failed to properly supervise the lockers rooms on November 24. Def.'s Motion at 13-16. As a preliminary matter, Corral may establish that his complaints caused his firing by showing that the complaints were a "substantial or motivating factor" in UNO's decision to fire him. *Leitgen v. Franciscan Skemp Healthcare, Inc.*, 630 F.3d 668, 675 (7th Cir. 2011) (citation and internal quotation marks omitted). Causation may be shown by a convincing mosaic of circumstantial evidence that would permit the inference of retaliation even without the employer's direct admission of discrimination. *Coleman v. Donahoe*, 667 F.3d 835, 860 (7th Cir. 2012) (internal quotation marks omitted). Admissible circumstantial evidence of causation generally falls into one of three categories: (1) suspicious timing, ambiguous statements oral or written, behavior toward or comments directed at other employees in the protected group, and other bits and pieces from which an inference of causation might be drawn, (2) evidence showing that the employer systematically treated other, similarly situated employees better, and (3) evidence that the employer's justification for the adverse action was pretextual. *Id.* Corral presents evidence of both the first and third varieties.

First, UNO does not dispute that the November 24, 2009 assault, which Corral was the first to report, was related to Corral's firing. *See* DSOF ¶ 28 ("Mr. Rangel

indicated that Corral was terminated *because the incident occurred* under his supervision . . . .") (emphasis added). And the timing of Corral's firing reinforces that connection—the incident occurred on November 24 and Corral was fired just ten days later on December 4. *Id.* ¶¶ 5, 24. Corral further argues, and a reasonable jury could conclude, that Rangel actually decided to fire Corral the very day he learned of the incident. In a November 26 email to another UNO administrator, Sister McCarry wrote that "[Rangel] is ready to fire the gym teacher." *See* R. 116-7, Pl.'s Group Exh. 23 at D000458 (11/26/09 McCarry Email). Although suspicious timing alone is rarely sufficient to establish causation, combined with other evidence, such as pretext, it can be enough to withstand summary judgment and create a question for the jury. *Coleman,* 667 F.3d at 862.

Is there evidence of pretext to combine with the suspicious timing? Both parties offer evidence on that point. UNO argues that the reason it fired Corral was not because he reported the assault, but because Corral was negligent in supervising his students on the day M.L. was attacked. Def.'s Motion at 15. Indeed, UNO's three witnesses testified to that effect. *See* DSOF ¶¶ 28 (Rangel), 36 (Gomez), 37 (McCarry). But Corral has sufficiently called into question the genuineness of UNO's stated reason for firing him. *See O'Leary v. Accretive Health, Inc.,* 657 F.3d 625, 635 (7th Cir. 2011) ("The question is not whether the employer's stated reason was inaccurate or unfair, but whether the employer honestly believed the reason it has offered to explain the discharge." (citation omitted)). Corral has solid evidence that at the time Rangel decided to fire Corral, Rangel did not even yet know that Corral was in his office taking

17

attendance during the assault. Rangel learned of the assault on November 26 and was ready to fire Corral then and there. PSAF ¶ 30. But there is evidence that Sister McCarry, who was conducting the investigation for UNO (and reporting to Rangel), did not learn until November *30* that Corral was in his office during the assault. *See* McCarry Notes at D000291 (notes dated November 30 state "(go to do attendance) office! Negligence!"). So if Rangel was ready to fire Corral on as early as November 26 (McCarry's email of that date said so), but did not learn until *after* that date that Corral was in his office, then a reasonable jury could find that Rangel's stated reason for the firing is a pretext. Put another way, a reasonable jury could conclude that when Rangel "was ready to fire" Corral, Rangel did not even know that Corral was absent from the locker rooms at the time of the assault. It is true that a jury need not draw the inferences just described, nor does the evidence preclude the possibility that Rangel simply assumed that Corral was not adequately supervising his students, and decided to fire Corral on that assumption. But of course the evidence need not require certain victory for Corral in order to survive summary judgment. It is enough to raise a genuine issue of fact for trial, which Corral has done, particularly when the evidence is combined with Rangel's deposition testimony. During the deposition, Rangel was asked whether he made the decision to fire Corral on the day Rangel learned of the assault. Rangel would not answer the question yes or no. He was asked the same question five different ways, and each time answered with the same non-responsive answer, the gist of which was that he was "prepared to hold whoever was responsible . . . accountable." R. 116-2, Pl.'s Exh. 2 (Rangel Dep.) at 21:11-23:10. The lack of a

straight answer on whether Rangel had decided to fire Corral on November 26, when Rangel did not even know that Corral was in his office during the assault (or at least a jury could so find), does undermine the stated reason for Corral's firing. Corral can reasonably argue to the jury that Rangel decided to fire Corral, then and there, for reporting the assault.

Finally, Corral argues that Sister McCarry's reaction to his comments about J.C.'s disciplinary problems (covering her ears and exclaiming "I can't hear that, I can't hear that," PSAF ¶ 36), is probative of pretext. It is not obvious what inference Corral wants the fact-finder to draw from this admittedly strange reaction, but one reasonable inference is that Sister McCarry, on behalf of UNO, was concerned about additional blame and attention being placed on the School for the incident, which is consistent with Corral's theory that UNO was worried about the negative attention it was receiving. At any rate, considering all of the evidence that Corral has presented on causation, he has met his burden to proceed past summary judgment on that element of his Title IX claim.[9] Because Corral has presented sufficient evidence to create a

---

[9]Corral offers additional evidence to "discredit[ ] UNO's explanation and impugn[ ] its motives," Pl.'s Resp. at 15, such as the fact that UNO's policy of requiring its teachers to take attendance in the first five minutes of class and also supervise the students at all times, was unreasonable. *Id.* at 15-16 (citing PSAF ¶¶ 5, 21-22). At trial, Corral may be allowed to offer evidence that UNO's stated reason for his termination does not have a basis in fact, *Grayson v. O'Neill*, 308 F.3d 808, 820 (7th Cir. 2002) (citation omitted), but "the focus of a pretext inquiry is. . . not whether [the employer's stated reason] was accurate, wise or well considered." *Smeigh v. Johns Manville, Inc.*, 643 F.3d 554, 561 (7th Cir. 2011) (citation omitted). Applying that standard, UNO's stated reason for firing Corral—that he was negligent in failing to supervise his students when he recorded attendance from his office—is not so outlandish that the reason *itself* suggests pretext. Federal courts "do not sit as a 'super personnel review board' that second-guesses an employer's facially legitimate business decisions." *See Argyropoulos v. City of Alton*, 539 F.3d 724, 736 (7th Cir. 2008) (internal quotation marks and citation omitted).

19

genuine issue of fact as to whether he engaged in statutorily protected activity, and whether that activity was a substantial factor in his firing, UNO's motion for summary judgment on Corral's Title IX claim is denied.

## B. Illinois Retaliatory Discharge Claim

UNO also moves for summary judgment on Corral's claim for retaliatory discharge under Illinois law. In Illinois, an employer may generally fire an at-will employee for any or no reason. *Jacobson v. Knepper & Moga, P.C.*, 706 N.E.2d 491, 492 (Ill. 1998) (citations omitted). The tort of retaliatory discharge is a "limited and narrow" exception to that discretion. *Id.* (citation omitted). To establish a cause of action for retaliatory discharge, a plaintiff must demonstrate that he was (1) discharged; (2) in retaliation for his activities; and (3) the discharge is in contravention of a clearly mandated public policy. *Zimmerman v. Buchheit of Sparta, Inc.*, 645 N.E.2d 877, 880 (Ill. 1994) (citation omitted). There is no dispute that Corral was fired, but the parties disagree whether Corral has presented sufficient evidence from which a reasonable jury could find that Corral's firing was in contravention of a clearly mandated public policy. Such a policy may arise under the Illinois state constitution, Illinois statutes, or judicial decisions rendered by Illinois state courts. *Turner v. Mem'l Med. Ctr.*, 911 N.E.2d 369, 374 (Ill. 2009) (quoting *Palmateer v. Int'l Harvester Co.*, 421 N.E.2d 876, 878 (Ill. 1981)). In his response brief to UNO's motion for summary judgment, Corral asserts three sources of a public policy for his retaliatory discharge

---

Whether evidence of the reasonableness (or unreasonableness) of UNO's attendance-taking policy is admissible at trial is a matter for pre-trial motions.

claim: (1) Title IX; (2) a "crime-fighter" policy arising from case law and provisions of the Illinois Criminal Code; and (3) the Illinois Abused and Neglected Child Reporting Act, 325 ILCS 5/9.1 *et seq*. Pl.'s Resp. at 21. The Court will address each of these arguments in turn, addressing first whether Corral's cited sources of law can serve as a clearly mandated public policy for a retaliatory discharge claim, and second (if the answer to the first question is yes), whether Corral has created a genuine issue of fact that UNO fired Corral in contravention of that public policy. As explained below, Corral's retaliatory discharge claim survives on the basis of the Illinois Abused and Neglected Child Reporting Act, as well as on a crime-fighter theory arising from case law and the state's Criminal Code, but not on the basis of Title IX.

But before proceeding to the substantive arguments on Corral's retaliatory discharge claim, there is a threshold issue on Corral's first and second arguments (Title IX and the Illinois Criminal Code), namely, whether he was too late in pointing to those sources. In its reply brief, UNO argues that Corral's complaint does not reference any public policy set forth within Title IX or the state's criminal code, and thus Corral's reliance on those policies must be barred as an improper attempt to amend his complaint. Def.'s Reply at 16-17, 19. It is true that Corral "may not amend his complaint through arguments in his brief in opposition to a motion for summary judgment." *Anderson v. Donahoe*, 699 F.3d 989, 997 (7th Cir. 2012) (internal quotation marks and citation omitted). But Corral's arguments about Title IX and the Illinois Criminal Code are new legal theories, not new claims that would require amending the complaint. *Hall v. Nalco Co.*, 534 F.3d 644, 649 n.3 (7th Cir. 2008) ("'[A] complaint need

not identify a legal theory, and specifying an incorrect theory is not fatal' to a plaintiff's claim." (quoting *Bartholet v. Reishauer A.G. (Zürich)*, 953 F.2d 1073, 1078 (7th Cir. 1992)). Corral may assert new legal theories as to UNO's liability for retaliatory discharge at this stage, so long as—and this is an important caveat—the theories are fully developed in his response brief *and* UNO is not harmed by the delay. *Hatmaker v. Mem'l Med. Ctr.*, 619 F.3d 741, 743 (7th Cir. 2010) (citation omitted). Whether Corral has fully developed his arguments with respect to Title IX and the Illinois Criminal Code, and whether UNO suffers harm from Corral waiting until now to make the arguments, is discussed more fully below.

### 1. Title IX

Corral first "argues"—but really only mentions—that a public-policy premise for his retaliatory discharge claim arises under Title IX. Pl.'s Resp. at 21. Although it is unlikely that UNO would be harmed by having to confront this new legal theory now—Title IX and the conduct it prohibits, including retaliation, has been an issue in this case from the start—the Title IX basis for the retaliatory-discharge claim is nevertheless rejected because Corral does not at all develop the argument in his response brief. In particular, Corral does not explain how a *federal* statute can provide a clearly mandated public policy for an Illinois common law retaliatory discharge claim. *See Palmateer*, 421 N.E.2d at 878, 881 (noting that a "clearly mandated public policy" may be found in *Illinois's* constitution, statutes or judicial decisions). In fact, Corral's entire argument as to the Title IX theory for his retaliatory discharge claim amounts to one sentence in his response brief, with a citation to an earlier section of

22

his brief explaining why Corral reasonably believed he was reporting sex discrimination. Pl.'s Resp. at 21 (citing Part I(C)). Because Corral does not explain how Title IX can supply a public policy for his retaliatory discharge claim, the argument is waived. *See United States ex rel. Hampton v. Leibach*, 347 F.3d 219, 244 (7th Cir. 2003) (citing *Palmquist v. Selvik*, 111 F.3d 1332, 1342 (7th Cir. 1997)).[10]

## 2. Illinois Criminal Code

Unlike Corral's Title IX argument, Corral develops his argument based in the Illinois Criminal Code in enough detail to avoid waiver. Corral argues he has created a genuine issue on whether UNO fired him for reporting a crime, and cites relevant case law establishing a public policy in Illinois in favor of crime reporting for the protection of the lives and property of the state's citizens. *See* Pl.'s Resp. at 22 (citing *Palmateer*, 421 N.E.2d at 879). In addition, UNO has not articulated any harm that UNO will suffer from having to rebut Corral's *legal* argument at this stage. As discussed below, the record on summary judgment shows that the *facts* relevant to Corral's theory that he was fired by UNO for reporting a crime was thoroughly explored during discovery, and UNO has not described any additional discovery it would have taken had it known about Corral's crime-fighter theory earlier.

Turning to Corral's substantive arguments, it is uncontroverted that there is a crime-fighter policy in Illinois that can serve as a public policy for common law

---

[10]UNO also argues that a retaliatory-discharge claim based on Title IX is preempted by the retaliation provision of the Illinois Human Rights Act, 775 ILCS 5/1-101 *et seq*. Def.'s Reply at 17-18. Because Corral's Title IX theory is waived, the Court does not address the merits of this argument.

retaliatory discharge claims. *See* Def.'s Reply at 20 (acknowledging the "'crime-fighter' line of cases"). In *Palmateer*, the Illinois Supreme Court held that "[t]he foundation of the tort of retaliatory discharge lies in the protection of a public policy, and there is a clear public policy favoring investigation and prosecution of criminal offenses." 421 N.E.2d at 880. Palmateer alleged that he was fired for supplying information to law enforcement authorities that a fellow employee might be involved in criminal activity, and the Supreme Court held that he adequately stated a public policy for his retaliatory discharge claim. *Id.* at 877, 880. Since the time that *Palmateer* was decided, the "citizen crime-fighter approach" has emerged as a common category of retaliatory discharge claims. *See, e.g., Mackie v. Vaughan Chapter-Paralyzed Veterans of Am., Inc.*, 820 N.E.2d 1042, 1046-48 (Ill. App. Ct. 2004) (reviewing crime-fighter retaliatory discharge cases). To seek relief under this theory, Corral need not prove that a criminal law was actually violated; it is enough that he had a good-faith belief that a crime had been committed when he made the report. *Belline v. K-Mart Corp.*, 940 F.2d 184, 188 (7th Cir. 1991) ("That the questionable conduct may later prove to be authorized and therefore legitimate is not dispositive."); *Stebbings v. Univ. of Chicago*, 726 N.E.2d 1136, 1144 (Ill. App. Ct. 2000).

Corral argues that he reported an incident of "bull[y]ing" or "fighting" when he first sent a text message to Avila, and that the investigation eventually revealed UNO students had committed several violations of the Illinois Criminal Code, including assault (720 ILCS 5/12-1), aggravated assault (720 ILCS 5/12-2), battery (720 ILCS 5/12-3), and criminal sexual abuse (720 ILCS 5/11-1.50). Pl.'s Resp. at 22. Specifically,

Corral repeatedly refers to the incident he reported as a "sexual assault," *see, e.g.* Corral Dep. 77:3-5; Corral Decl. ¶ 31. Based on that testimony, Corral argues, a reasonable jury could find that Corral believed he was reporting a crime, if not at the time he sent the text message to Avila, then certainly while he continued to participate in the investigation.[11]

UNO responds that the crime-fighter policy should not apply to Corral's retaliatory discharge claim because he was not reporting a crime committed by UNO or another UNO employee. Def.'s Reply at 20-21. According to UNO, the crime-fighter line of cases does not extend to a claim like Corral's, where he alleges he was fired by a school for reporting the criminal activity of a student, rather than an UNO employee. *Id.* The Court disagrees. It is true that retaliatory-discharge cases premised on crime-fighting all appear to involve an employee reporting suspected criminal activity by the employee's employer or co-workers. But nothing about the policy rationale underlying those cases suggests that crime-reporting claims should be limited specifically only to employer- or employee-committed crimes. To the contrary, *Palmateer* emphasized a *general* policy of enforcing the state's criminal code through reports of criminal behavior:

> There is no public policy more basic, nothing more implicit in the concept of ordered liberty, than the enforcement of a State's criminal code. . . . *Public policy favors the exposure of crime*, and the cooperation of citizens possessing knowledge thereof is essential to effective implementation of that policy.

---

[11]Corral need not have reported a crime directly to the police; it is sufficient if he reported suspected criminal activity internally to his employer. *Michael v. Precision Alliance Grp., LLC*, 952 N.E.2d 682, 688 (Ill. App. Ct. 2011) ("[I]n no instance has Illinois required an employee to make a direct report to a government agency." (citation omitted)).

421 N.E.2d at 879-80 (emphasis added) (internal quotation mark and citations omitted). Consider an example where an employee reports a crime that is not committed by the employer or a co-worker, and ask whether Illinois's crime-fighting public policy applies to protect that employee: an accountant works at an accounting firm, and during an audit of a client's records, discovers that the client has cooked the books and had engaged in accounting fraud. The accountant reports the crime to the firm. If the firm fires the accountant for reporting the crime, then that retaliatory firing undermines the exposure of crime just the same as if a co-worker at the firm was the one cooking the client's books. The crime-reporting public policy is not limited to reporting crimes by the employer or co-workers. So Corral can claim the protection of the crime-reporting public policy.

Still, though, Corral also must submit enough evidence to convince a reasonable jury that his firing was in retaliation for reporting a crime. In other words, is there evidence that UNO fired Corral *because* he reported a crime? Much of the discussion on Corral's Title IX claim applies here, including the timing of Corral's firing and the evidence that UNO's stated reason was pretextual. Corral has presented some additional evidence that UNO and its administrators were particularly concerned that a crime had possibly been committed on its campus and that the police were involved. For example, Corral avers that Principal Gomez and Sister McCarry told him that UNO had sent a representative to meet with the victim's family to try to persuade them to drop charges against the attackers. PSAF ¶ 33; Corral Decl. ¶ 35. There is also evidence that UNO administrators were specifically concerned that Chicago police

officers were called to the scene. *See* R. 116-7, Pl.'s Exh. 20 (Director's Report of Incident) at D000305 (listing "[l]ack of communication with [UNO] regarding police involvement at Garcia [High School]" as an "area of concern"). Although a jury could find that UNO fired Corral for other legitimate reasons (because he failed to supervise the locker rooms, or simply to hold someone accountable for an attack that occurred on campus), Corral has presented enough evidence to create a genuine issue of fact for trial on the crime-fighter theory for his retaliatory discharge claim, and summary judgment as to that claim is denied.

### 3. Illinois Abused and Neglected Child Reporting Act

As his third and final source of public policy, Corral has asserted that the Illinois Abused and Neglected Child Reporting Act, 325 ILCS 5/9.1 *et seq.,* establishes a basis for his retaliatory discharge claim. This legal theory did make an appearance in the complaint. In Count 2 of the complaint, Corral specifically references and quotes from the Act, stating that "Mr. Corral's termination . . . is a clear violation of the [employer discrimination provision of the Act]," and that "UNO deliberately and intentionally terminated Mr. Corral's employment in retaliation for reporting suspected child abuse." Compl. ¶¶ 51-52 (citing 325 ILCS 5/9.1). The employer discrimination provision of the Act provides:

> No employer shall discharge, demote or suspend, or threaten to discharge, demote or suspend, or in any manner discriminate against any employee who makes any good faith oral or written report of suspected child abuse or neglect, or who is or will be a witness or testify in any investigation or proceeding concerning a report of suspected child abuse or neglect. For purposes of this Section "child abuse or neglect" includes abuse or neglect of an adult resident as defined in this Act.

Corral argues that this provision in particular spells out a "clear mandate of public policy" for his retaliatory discharge claim. Pl.'s Resp. at 21. In moving for summary judgment on this theory of retaliatory discharge, UNO argues that (1) the Act does not give rise to a public policy for Corral's claim because Corral did not make a "report" to the Illinois Department of Child and Family Services (DCFS); and (2) Corral did not reasonably believe that he was reporting "child abuse" under the Act. Def.'s Motion at 17-25.

For the most part, UNO's arguments re-tread the same ground as its earlier motion for judgment on the pleadings, which was denied. *See* R. 48, Def.'s Mot. J. Pleadings; August 15, 2011Order. Turning to UNO's first argument, as the Court previously held, it was not necessary for Corral to make a report to DCFS in order to now rely on the Act as the source of public policy for his retaliatory discharge claim. "As long as Corral participated in a potential DCFS report, he is protected." August 15, 2011 Order (citing *Nosbaum ex rel. Harding v. Martini*, 726 N.E.2d 84, 90 (Ill. App. Ct. 2000)). UNO attempts to distinguish *Nosbaum* from this case, because in *Nosbaum* the doctor seeking protection under the Act did not report suspected abuse directly to DCFS, but a social worker did make a report to DCFS at the doctor's direction. 726 N.E.2d at 87. Therefore, UNO argues, *Nosbaum* does not defeat the principle that for Corral to succeed, *someone* must have made a report of child abuse to DCFS. Def.'s Motion at 19-20. UNO misses the point. Corral is not bringing a direct claim against UNO under the employer discrimination provision of the Act. Corral's theory of liability for retaliatory discharge is that the Act creates a *public policy* in favor of reporting

28

suspected instances of child abuse, and that UNO contravened that policy by firing Corral for reporting (even though not externally) that UNO might be liable for child abuse because UNO put students in the locker room at risk. To be sure, as discussed below, there is a question as to whether Corral has presented sufficient evidence that he reasonably believed he was reporting child abuse, and that UNO fired him in retaliation for the report. But the Act sets forth a public policy for child-abuse reporting and can serve as the basis for Corral's retaliatory discharge claim. *See Bea v. Bethany Home, Inc.*, 775 N.E.2d 621, 624 (Ill. App. Ct. 2002) ("This court has previously recognized that [the Act] has a dual purpose: to protect abused children and to protect alleged abusers from the damaging effects of erroneous or false reports." (citations omitted)); *see also* 325 ILCS 5/2(a) ("Recognizing that children also can be abused and neglected . . . while attending . . . schools, . . . this Act also provides for the reporting and investigation of child abuse and neglect in such instances."); *Cromley v. Bd. of Educ. of Lockport Twp. High Sch. Dist. 205*, 699 F. Supp. 1283, 1297 (N.D. Ill. 1988) ("[The Act] demonstrates the importance which society has placed on the reporting of child abuse.").[12]

---

[12]*Cromley* ultimately dismissed the retaliatory discharge claim because the "*raison d'etre* for the retaliatory discharge cause of action . . . [is] affording relief to otherwise remediless plaintiffs," and the court found that Cromley's § 1983 claim provided adequate relief. 699 F. Supp. 1297-98. UNO did not argue that Corral's retaliatory discharge claim is precluded by his Title IX claim, so that argument is waived. Regardless, the argument would likely fail, because Corral's Title IX claim is actually based on a slightly different version of the events than his retaliatory-discharge claims. Corral's Title IX claim depends on the jury finding that Corral reported, and was fired for reporting, sex discrimination under Title IX. Even if a jury finds against Corral on his Title IX claim, it could still find that he was improperly fired for reporting a crime (such as assault or battery), or that UNO improperly fired Corral for drawing attention to UNO's alleged negligence in allowing an assault to occur. Therefore,

Turning to whether a reasonable jury could find that Corral believed he was reporting child abuse, Corral has enough (though barely enough) evidence to permit him to get past summary judgment. The Act defines an "abused child" as a child who "any person responsible for the child's welfare . . . *allows to be inflicted* upon such child physical injury, by other than accidental means, which causes . . . impairment of physical or emotional health . . . or *allows to be committed* any sex offense against such child . . ." 325 ILCS 5/3 (emphases added). Corral first reported the November 24 incident in the locker room as a "fight" or "bull[y]ing." DSOF ¶ 11. UNO argues that Corral could not reasonably believe he was reporting child abuse because the attack was committed by a student, and not someone "responsible for the child's welfare." Def.'s Motion at 22. But the Act defines "person responsible for the child's welfare" as "any . . . person responsible for the child's welfare at the time of the alleged abuse or neglect," and the definition specifically lists "educational personnel" (and remember that the definition of abused child encompasses within it those that *allow* abuse to occur). 325 ILCS 5/3. Corral's theory is that he believed *UNO* (not the student attackers) might be liable for child abuse because UNO negligently created an environment where abuse was likely to occur.

Although Corral's evidence is thin, it is enough to withstand summary judgment when viewed in his favor. Corral complained about the lack of supervision in the locker rooms both before and after November 24, Corral Decl. ¶¶ 15-16; 11/30/09 Corral

---

Corral may assert both his federal and state claims simultaneously, because the policies behind the claims serve different goals. *See id.* at 1298.

Email, and he complained that the policy requiring teachers to take attendance in the first five minutes of class was problematic because his students had to change during that time, Corral Decl. ¶ 18; 8/25/09 Corral Email; 9/15/09 Corral Email. Corral also questioned Sister McCarry and Principal Gomez's decision to allow one of the attackers to return to school given the student's disciplinary record and medical issues. Corral Decl. ¶ 39. Finally, Corral specifically referenced his duty to report suspected abuse in his final meeting with Sister McCarry and Principal Gomez. *Id.* ¶ 37. Even though the latter two comments by Corral were made *after* he was fired, they are still relevant to his state of mind and whether he believed he was reporting abuse under the Act *before* he was fired. From these facts, a reasonable jury could find that Corral believed he was making an internal report of child abuse under the Act because he believed UNO's negligence led to the assault in the locker room.

Corral must also raise a genuine issue of fact that UNO fired Corral *because* he was trying to report UNO's responsibility for child abuse under the Act. For reasons explained throughout this opinion, Corral has sufficiently called into question UNO's stated reason for firing Corral. For example, when Corral questioned UNO's decision to allow one of the attackers to return to school, Sister McCarry stood up, covered her ears, and said, "I can't hear this, I can't hear this." Corral Decl. ¶ 40. When considered as a whole, there is a sufficient basis on which a reasonable jury could find that UNO fired Corral because UNO did not like Corral's accusations that the School was potentially negligent. If the jury believes this version of the events, UNO's firing of Corral would contravene a clearly mandated public policy in that UNO would be

31

discouraging teachers with knowledge of abuse from coming forward for fear of retaliation.

UNO raises one last argument with respect to Corral's theory of liability based on the Act. In its reply brief, UNO argues that *Jacobson v. Knepper & Moga, P.C.*, 706 N.E.2d 491 (Ill. 1998), requires that the Court grant summary judgment on Corral's claim under the Act because the Act itself has sufficient safeguards to encourage the reporting of child abuse, and therefore expanding the tort of retaliatory discharge to these circumstances is unnecessary. Def.'s Reply at 14-15. In *Jacobson*, an attorney sued his former law firm for retaliatory discharge, claiming he was fired because he made an internal complaint that the firm was filing consumer debt collection actions in violation of the venue provisions of the applicable statute. 706 N.E.2d at 492. In considering the law firm's motion to dismiss the complaint, the Illinois Supreme Court noted that the state's rules of professional conduct independently required Jacobson to report the violation. *Id.* at 493 (citing Rule 3.3(a)(1) of the Illinois Rules of Professional Conduct). The Illinois Supreme Court held that because "the attorney's ethical obligations serve to adequately protect the public policy established by the statutes . . . it is unnecessary to expand the limited and narrow tort of retaliatory discharge to the employee attorney." *Id.* at 493. UNO argues that *Jacobson* is analogous to this case, because anyone who fails to report suspected child abuse as required by the Act is guilty of a Class A misdemeanor. *See* 325 ILCS 5/4. Therefore, UNO argues, there are sufficient safeguards to ensure that suspected child abuse does not go unreported, and it is unnecessary to go further in encouraging abuse-reporting

32

by giving those who make reports the right to file a retaliatory discharge claim. Def.'s Reply at 15.

The Court rejects this argument. First, cases decided since *Jacobson* have specifically held that the Act may support a claim for retaliatory discharge. *See Bea*, 775 N.E.2d at 624; *Cromley*, 699 F. Supp. at 1297. Second, an examination of the case on which *Jacobson* relies reveals that the Illinois Supreme Court was particularly focused on the special characteristics of the attorney-client relationship and the idea that an extra incentive to report crimes or other misdeeds is not necessary in that context. *Jacobson* had to decide whether to expand the Illinois Supreme Court's holding in *Balla v. Gambro, Inc.*, 584 N.E.2d 104 (Ill. 1991). *Balla* held that a general counsel could not sue his company for retaliatory discharge where the attorney alleged he was fired for reporting the company's violations of law. *Id.* at 105, 107. But the *Balla* decision was specifically dependent on "the effect on the attorney-client relationship that extending the tort [of retaliatory discharge] would have." *Id.* at 108. Such a rationale does not apply to Corral's claim, and UNO cites no cases where the principle in *Jacobson* or *Balla* was extended beyond an attorney's claims.

Therefore, Corral's retaliatory discharge claim based on the theory that UNO fired him for reporting child abuse, in contravention of the public policy established by the Illinois Abused and Neglected Child Act, survives summary judgment, and UNO's motion in that respect is denied.

33

## IV.

For the reasons stated above, UNO's motion for summary judgment [R. 106] is denied. At the upcoming status hearing on May 14, 2013, the parties should be prepared to address the case schedule moving forward, including whether a settlement conference is sensible.

ENTERED:


    s/Edmond E. Chang    
Honorable Edmond E. Chang
United States District Judge

DATE: May 1, 2013